No. 12-2860

UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff-Appellee,

      v.

JILAINE H. BAUER,

                    Defendant-Appellant.

**On Appeal From the United States District Court
for the Eastern District of Wisconsin
Case No. 03-C-01427
The Honorable Charles N. Clevert, Jr., District Judge**

**BRIEF AND APPENDIX OF DEFENDANT-APPELLANT**

Mark A. Cameli                     Stephen J. Crimmins
Ryan S. Stippich                    K&L Gates LLP
Reinhart Boerner Van Deuren s.c.     1601 K Street NW
1000 North Water Street, Suite 1700    Washington, DC 20006
Milwaukee, WI 53202              Telephone:  202-778-9000
Telephone:  414-298-1000         Facsimile:  202-778-9100
Facsimile:  414-298-8097

Attorneys for Defendant-Appellant, Jilaine H. Bauer

## DISCLOSURE STATEMENT

The undersigned, counsel of record for Jilaine H. Bauer, Defendant-Appellant, furnishes the following list in compliance with Circuit Rule 26.1:

1. The full name of every party that the attorney represents in the case: the undersigned counsel represents defendant-appellant, whose full name is Jilaine H. Bauer.

2. Defendant-Appellant is not a corporation and therefore does not have: (a) a parent corporation or (b) stockholders which are publicly owned companies.

3. The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   - Fox O-Neill & Shannon S.C. (initial counsel in the district court)

   - Reinhart Boerner Van Deuren s.c.

   - K&L Gates LLP

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ............................................................................................. iii

JURISDICTIONAL STATEMENT ...................................................................................1

STATEMENT OF ISSUES PRESENTED .......................................................................1

STATEMENT OF THE CASE ..........................................................................................2

STATEMENT OF FACTS ..................................................................................................4

SUMMARY OF ARGUMENT .......................................................................................19

STANDARD OF REVIEW ..............................................................................................19

ARGUMENT .....................................................................................................................20

I. The District Court Erred in Denying Bauer's Motion for Summary
Judgment Because Insider Trading Liability Should Not Apply as a Matter
of Law to Mutual Fund Redemptions........................................................................20

  A. In Mutual Fund Redemptions There Is No "Deception" of
"Shareholders with Whom the Insider Transacts" That Would
Trigger the "Disclose or Abstain" Duty.........................................................22

  B. In Fund Redemptions Pricing Is Derivative, Based on Prices of
Multiple Portfolio Securities, and Not Based on Information About
the Fund..................................................................................................................25

  C. In Fund Redemptions There Is No Concealment from a Trading
Market of Information Needed to Fairly Price the Security. .......................26

  D. In Redeeming Their Fund Shares the Fund's Employees Cannot
Reasonably Be Expected to Second-Guess Its Valuation
Determinations. ...................................................................................................28

  E. Congress and the SEC Have Recognized That Mutual Fund
Transactions Inherently Do Not Present Risks of Improper Trading
Activity. .................................................................................................................30

II.   Assuming, *Arguendo*, That Insider Trading Liability Can Be Extended to Mutual Fund Redemptions, the District Court Erred in Granting the SEC Summary Judgment on the Highly Fact-Specific Issue of Materiality....................32

    A.   A Jury Should Be Permitted to Determine Whether Nonpublic Information Unrelated to the Price of the Short Duration Fund Was Material......................................................................................................34

    B.   Even with Respect to the Categories of Nonpublic Information Irrelevant to the Price of the Short Duration Fund, the District Court Erred by Failing to View the Evidence in a Light Most Favorable to Bauer. ...............................................................................36

    C.   The District Court Failed to Grant Bauer Favorable Inferences from the Undisputed Facts Showing the Potentially Negative Information Was Already Public. ..................................................39

    D.   The District Court Failed to Grant Bauer Favorable Inferences from the Undisputed Facts Showing the Nonpublic Information at the Time of Her Redemption Was Positive, Rendering Earlier Negative Information Immaterial. ..................................................................41

    E.   Bauer Could Not Foretell the October 13 "Haircut," Which Is the Only Potential Nonpublic Information in the Record That Had an Effect on the Short Duration Fund's Price. ......................................43

III.  The District Court Erred in Determining the Element of Scienter Against Bauer. ..................................................................................................45

    A.   The District Court Failed to Grant Bauer Favorable Inferences from the Undisputed Facts Showing She Acted Without Scienter. ......................46

    B.   The District Court Erred in Drawing Inferences Favorable to the SEC and Rejecting Inferences Favorable to Bauer Drawn from the Same Facts. ...................................................................................49

CONCLUSION ....................................................................................................52

CERTIFICATE OF COMPLIANCE ........................................................................53

CIRCUIT RULE 30(d) STATEMENT REGARDING APPENDIX .....................................54

CERTIFICATE OF SERVICE .................................................................................55

APPENDIX

# TABLE OF AUTHORITIES

**Page**

**Cases**

Basic Inc. v. Levinson,
   485 U.S. 224 (1988)...................................................................32

Bennett v. Local Union No. 66,
   958 F.2d 1429 (7th Cir. 1992)...................................................19

Chiarella v. United States,
   445 U.S. 222 (1980)...................................................................23

Dirks v. S.E.C.,
   463 U.S. 646 (1983)...................................................................24

Elkind v. Liggett & Myers, Inc.,
   635 F.2d 156 (2d Cir. 1980) ....................................................34

Freeman v. Decio,
   584 F.2d 186 (7th Cir. 1978).....................................................50

Harley-Davidson Motor Co. v. PowerSports, Inc.,
   319 F.3d 973 (7th Cir. 2003) ...............................................19, 20

In re Chavin,
   150 F.3d 726 (7th Cir. 1998).....................................................45

In re Morgan Stanley Info. Fund Sec. Litig.,
   592 F.3d 347 (2d Cir. 2010) ....................................................34

In re Van Wagoner Funds, Inc. Sec. Litig.,
   382 F. Supp. 2d 1173 (N.D. Cal. 2004) ..................................34

Keri v. Bd. of Trs. of Purdue Univ.,
   458 F.3d 620 (7th Cir. 2006)....................................................20

LHLC Corp. v. Cluett, Peabody & Co.,
   842 F.2d 928 (7th Cir. 1988)....................................................35

Loudermilk v. Best Pallet Co.,
   636 F.3d 312 (7th Cir. 2011)....................................................20

*Matrixx Initiatives, Inc. v. Siracusano,*
    131 S.Ct. 1309 (2011)..............................................................................................32

*McConville v. S.E.C.,*
    465 F.3d 780 (7th Cir. 2006) ..............................................................................45

*P.H. Glatfelter Co. v. Voith, Inc.,*
    784 F.2d 770 (1986) ..............................................................................................45

*S.E.C. v. Jakubowski,*
    150 F.3d 675 (7th Cir. 1998)..............................................................................35

*S.E.C. v. Lipson,*
    278 F.3d 656 (7th Cir. 2002)..............................................................................51

*S.E.C. v. Lyttle,*
    538 F.3d 601 (7th Cir. 2008) ..............................................................................45

*S.E.C. v. Pentagon Capital Management PLC,*
    844 F. Supp. 2d 377 (S.D.N.Y. 2012)..............................................................25

*S.E.C. v. Texas Gulf Sulphur Co.,*
    401 F.2d 833 (2d Cir. 1968) ......................................................................26, 34

*Santa Fe Indus. v. Green,*
    430 U.S. 462 (1977)..............................................................................................23

*Siliven v. Ind. Dep't of Child Servs.,*
    635 F.3d 921 (7th Cir. 2011) ..............................................................................20

*Sundstrand Corp. v. Sun Chem. Corp.,*
    553 F.2d 1033 (7th Cir. 1977) ............................................................................45

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976)..............................................................................................32

*United States v. O'Hagan,*
    521 U.S. 642 (1997)......................................................................................23, 24

*Yu v. State St. Corp.,*
    686 F. Supp. 2d 369 (S.D.N.Y. 2010)..............................................................35

**Statutes**

15 U.S.C. § 77q(a) ..................................................................................1, 4
15 U.S.C. § 77v(a) ......................................................................................1
15 U.S.C. § 78aa ........................................................................................1
15 U.S.C. § 78j(b) ...................................................................................1, 4
15 U.S.C. § 78t-1 ......................................................................................23
15 U.S.C. § 80a-17(j) ...............................................................................30
15 U.S.C. § 80a-35(a) ...........................................................................1, 4
15 U.S.C. § 80a-43 .....................................................................................1
28 U.S.C. § 1331 ........................................................................................1
28 U.S.C. § 1391 ........................................................................................1

**Other Authorities**

*Cady, Roberts & Co.*,
    40 S.E.C. 907, 1961 WL 60638 (Nov. 8, 1961) ........................................23, 24

*David W. Baldt*,
    SEC Release No. 418, 2011 WL 1506757 (ALJ Apr. 21, 2011) ....................................29

Donald C. Langevoort, 18 *Insider Trading: Regulation, Enforcement, &*
    *Prevention* § 5:2......................................................................................34

*Jilaine H. Bauer, Esq.*,
    Exchange Act Release No. 67845, 2012 WL 3992034 (Sept. 12, 2012)..........................4

*John D. Hammes*,
    SEC Release No. 8346, 2003 WL 22926836 *(Dec. 11, 2003)*..........................................24

Mercer E. Bullard, *Insider Trading in Mutual Funds*,
    84 Ore. L. Rev. 821, 839 (2005) ................................................................27, 34

Prevention of Certain Unlawful Activities with Respect to Registered
    Investment Companies,
    SEC Rel. IC-11421, 45 Fed. Reg. 73,915, 73,919 (Nov. 7, 1980) ...................................31

S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4923 ...........................30

*S.E.C. v. Marquardt*,
    SEC Litig. Release No. 21383, 2010 WL 191749 (Jan. 20, 2010) ...................................21

**Rules**

Fed. R. Civ. P. 56......................................................................................................................20

**Regulations**

17 C.F.R. § 270.22.............................................................................................................6, 25
17 C.F.R. § 275.204A-1 ............................................................................................................32
17 C.F.R. § 270.17j-1..........................................................................................................29, 30

## JURISDICTIONAL STATEMENT

The district court had jurisdiction of the subject matter of this action, and the parties hereto, pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 77v(a), 78aa and 15 U.S.C. § 80a-43 because the plaintiff-appellee Securities and Exchange Commission ("SEC") charged insider trading in violation of the federal securities laws, 15 U.S.C. §§ 77q(a), 78j(b) and 80a-35(a).

The basis for the Court of Appeals' jurisdiction is 28 U.S.C. § 1391, as defendant-appellant Jilaine H. Bauer ("Bauer") appeals from a final judgment of the district court, which disposed of all claims as to all parties. As no post-judgment motion was filed, the appeal is timely pursuant to Rule 4(a)(1)(B) because the district court entered judgment on June 15, 2012, and the notice of appeal was filed on August 10, 2012.

## STATEMENT OF ISSUES PRESENTED

1. Whether the district court erred in deciding a legal question of first impression – whether a redemption of mutual fund shares can constitute insider trading (i) where the insider has not deceived her trading counterparty, (ii) where such fund shares are not traded in or valued by any market, (iii) where the shares must be redeemed by their issuer at a fixed price based on valuation of the fund's underlying portfolio, (iv) where pricing does not depend on market assessment of publicly available information, and (v) where the same fixed price is given to all persons who redeem fund shares on a given day.

2.   Whether, assuming *arguendo* that a cognizable claim for mutual fund insider trading exists, the district court erred in granting summary judgment in favor of the SEC on its insider trading claim where the court held information unrelated to the price of the mutual fund was material as a matter of law, and where the court weighed evidence and selected inferences from the facts adverse to Bauer, the non-moving party.

3.   Whether, assuming *arguendo* that a cognizable claim for mutual fund insider trading exists, the district court erred in granting summary judgment in favor of the SEC on its insider trading claim where the court weighed evidence, chose inferences from the facts adverse to Bauer, the non-moving party, and where record evidence shows that a reasonable jury would conclude Bauer lacked scienter.

## STATEMENT OF THE CASE

This case is exceptional in a number of ways.  First, it comes to this Court on an insider trading claim relating to a single mutual fund redemption by Bauer twelve years ago, on October 3, 2000, that the SEC claims was based on inside information.  Second, it involves an unprecedented extension of insider trading liability by the district court to mutual fund redemptions.  Bauer is not aware of any other federal court adjudicated decision recognizing this liability, and neither the SEC nor the district court cited any such authority.  Third, in concluding as a matter of law that Bauer was guilty of insider trading, the district court weighed evidence and resolved inherently fact-specific issues of materiality and scienter on summary judgment - issues that courts have cautioned are rarely amenable to summary judgment determination. And this case was clearly *not* amenable to summary judgment in favor the plaintiff SEC.

2

However, this case did not start out simply as an insider trading case against Bauer. Rather, it started as a complex enforcement action by the SEC against a mutual fund investment advisor called Heartland Advisors, Inc. ("HAI"), and eight individual defendants. Among the defendants were HAI's CEO, COO, and several portfolio managers, in addition to Bauer, who was HAI's then-general counsel (among other titles). (Dkt. #283.)[1]

The complaint, filed on December 11, 2003, was brought after two municipal bond funds managed by HAI were liquidated. (Dkt. #1.) The amended complaint, filed in October 2005, set forth nine counts containing different alleged violations of the securities laws by the defendants. (Dkt. #283.)

Over four years after the initiation of the action, all of the other defendants except Bauer consented to administrative settlements "without admitting or denying" liability (Dkt. #391), and on February 21, 2008 the SEC stipulated to dismissal of the present action with prejudice as to all of the other defendants (Dkt. #395.)

In May and June, 2008, Bauer and the SEC cross-moved for summary judgment solely on the insider trading charge against Bauer. (Dkt. #399, 411.) On March 31, 2011, the district court granted the SEC's motion and denied Bauer's motion. (App. 1-2.) On May 25, 2011, the district court denied reconsideration (App. 42-44) and issued its opinion supporting its March 31, 2011 order (App. 3-41).

———————————————

[1] Bauer cites to the district court record as follows: citations to "Dkt. #__" refer to documents filed with the district court and entered on the court's docket. Citations to "App. __" refer to the appendix bound to this brief as required by Circuit Rule 30(a), and includes the district court's opinion and findings of fact at App. 3-41.

On September 20, 2011, the district court entered an order upon the SEC's voluntary dismissal motion (Dkt. #460), dismissing "with prejudice" all other charges against Bauer with the exception of claims "relating solely to Bauer's insider trading as discussed in the Court's May 25, 2011, decision."  (App. 45.)

After considering briefs on remedies issues, the Court issued its June 15, 2012 decision on remedies that denied the SEC's request for an injunction, denied the SEC's request for a monetary penalty, but ordered Bauer to disgorge $20,033.25 in "losses avoided," and $2,032.86 in interest, based on alleged insider trading in violation of 15 U.S.C. §§77q(a), 78j(b) and 80a-35(a).  (App. 46-51.)  The Court entered final judgment the same day.  (App. 52.)

On September 12, 2012, twelve years after the single mutual fund redemption at issuer here and just as the present brief was being prepared, the SEC without notice issued a summary order forthwith suspending Bauer from practice as a securities lawyer, based on the district court's June 15, 2012 judgment presently on appeal to this Court.  *Jilaine H. Bauer, Esq.*, Exchange Act Release No. 67845, 2012 WL 3992034 (Sept. 12, 2012).  Bauer has the right to appeal the suspension to SEC through a petition for administrative review, the determination of which will then run concurrently with Bauer's appeal to this Court.

## STATEMENT OF FACTS

From 1998 to 2002, Bauer was General Counsel and Chief Compliance Officer of HAI, an investment adviser and a broker-dealer registered with the SEC.  (App. 4-5.) Before that, she had been employed for eighteen years by Stein Roe & Farnham in

4

Chicago, Illinois, ultimately as its General Counsel and Chief Compliance Officer.  (Dkt. #400[2] ¶2.)[3]  She maintained securities licenses for most of her career, and was registered in good standing at all times with no formal or informal complaints filed against her.  (Dkt. #400 ¶5.)[4]  Bauer has never otherwise been named in any lawsuit or administrative proceeding.  (Dkt. #400 ¶6; App. 48.)

HAI managed the mutual fund portfolio series of Heartland Group, Inc. ("HGI"), an open-end management investment company also registered with the SEC, and acted as the principal underwriter and distributor of the funds' shares, including its Short Duration High-Yield Municipal Fund (the "Short Duration Fund" or the "Fund") and its High–Yield Municipal Bond Fund (the "High Yield Fund" and collectively the "Funds").  (App. 4-5.)  As originally filed, this case involved both Funds, but the SEC's remaining charge against Bauer involves only the Short Duration Fund.  (*Id.*)

### A. The Price of the Short Duration Fund, Like All Mutual Funds, Was Based on NAV, Not Market Pricing.

Open-end mutual funds like those involved in this case do not trade on an exchange or over-the-counter.  (App. 8.)  Instead, their shareholders are required to conduct their transactions directly with the mutual funds themselves.  (*Id.*)  Thus, an open-end fund

---

[2] "Dkt. #400" refers to Bauer's proposed findings of fact filed with her motion for summary judgment.  Exhibits to Bauer's proposed findings of fact were filed at Dkt. #402 and are cited herein as "Tab __, __."  "Dkt. #426" refers to Bauer's reply to the SEC's response Bauer's proposed findings of fact, and Bauer's response to the SEC's additional proposed findings of fact in opposition to Bauer's motion.  "Dkt. #427" refers to Bauer's additional proposed findings of fact in opposition to the SEC's cross-motion.  Exhibits filed in support of these findings were filed at Dkt. #428 and are cited herein as "Supp. Tab. __, __."

[3] Tab 1, 43:18-44:4; Tab 19, ¶2.

[4] Tab 19, ¶5.

"issues" as many shares as there is demand for in a given day, and "redeems" unwanted

shares.  (*Id.*)

All transactions on any day get the exact same price.  SEC Rule 22c–1, under

Section 22(c) of the Investment Company Act, requires a mutual fund to redeem its

shares at a price based on its current net asset value, referred to as a fund's "NAV."

17 C.F.R. § 270.22c-1(a).  (*Id.*)  A fund calculates its NAV by valuing each asset (for the

most part, securities) owned by the fund, adding the values together, subtracting any

liabilities, and then dividing the net value of the portfolio by the number of shares

outstanding.  (*Id.*)  Funds publish their NAV at the end of each day.  (*Id.*)

HGI's Short Duration Fund and High Yield Fund invested in municipal securities.

The municipal securities market lacks many of the systemic protections that are present

in many other sectors of the U.S. capital markets, and the kind of detailed registration

and periodic disclosure system established by the federal securities laws and the SEC

for public companies.  (App. 7.)  For this reason, disclosure about municipal bonds is

less comprehensive and more elusive.  Because little information is available and

trading activity is limited, pricing of municipal bonds is difficult.  (App. 8; Dkt. #400

¶¶24-25.)

### B.  Use of Independent Pricing Service in Setting NAV

To set its Funds' NAV's, HGI's board established a set of Pricing Procedures.

(App. 8-9.)  These Pricing Procedures included a non-exclusive list of factors to consider

in making fair value determinations.  (Dkt. #400 ¶¶34-39.)  Importantly, none of those

pricing factors was related to attributes of the mutual fund itself such as loan balances

6

or projected redemption activity.  (Dkt. #400 ¶39.)[5]

HGI's Pricing Procedures specified that the NAV should generally be based upon valuations published by an independent pricing service, Muller Financial Corporation ("Muller"), also known as Interactive Data Corp. ("IDC").  (App. 9.)  This reflected the Board's determination that market quotations for most of the Funds' debt securities were not readily available.  (*Id.*)  The use of independent pricing services such as Muller is common among municipal bond funds.  (Dkt. #400 ¶43)[6]  Muller was well regarded, and it represented to Heartland that it used a comprehensive process, including dedicated research analysts, to value municipal securities.  (Dkt. #400 ¶¶44-46.)[7]  Muller also indicated it supplied municipal securities prices to more institutions than any other company and priced the majority of municipal bond funds and fund assets in the United States, providing prices for more than 1.3 million active securities.  (*Id.*)

The Pricing Procedures required the portfolio manager to "challenge" any Muller valuation if, after discussions with Muller, the portfolio manager did not believe Muller's proposed price represented fair value.  In that case, the portfolio manager was to submit the security to HAI's pricing committee to make a fair value determination.  (Dkt. #400 ¶37.)[8]

Bauer chaired meetings of the pricing committee to review pricing information

---

[5] Tab 45, HAI031152-57 (Section IV.D.).

[6] Tab 21, 22-24.

[7] Tab 48, FRA0000682-685; Tab 4, 173:24-176:22.

[8] Tab 45, HAI031152-57 (Section I.C.).

presented to the Funds' board, prepared and maintained meeting minutes, and voted on pricing actions for individual securities from time to time.  (App. 8.)  But she never herself provided the Funds' pricing service with information, nor did she participate in substantive discussions with the pricing service about the valuations they provided. (App. 9.)

Bauer had no experience as a municipal bond fund portfolio manager, credit research analyst or trader.  (App. 5.)  She was not a member of HAI's investment policy committee, which reviewed investment strategies, sector and industry weightings, and performed risk management oversight.  (App. 6.)   She was a member of HAI's credit committee, which oversaw creditworthiness of bonds held by the Funds, but at no time prior to her redemption did she review portfolio managers' or credit analysts' credit files or have access to computer software with credit information.  (*Id.*; Dkt. #400 ¶¶41-42.)

### C.  Events in the Months Before Bauer Redeemed

*August-September Redemption Information.*  On August 10, 2000, at an HGI board meeting, one of the directors opined that the Funds needed to be prepared for more redemptions.  (App. 10.)  Bauer reacted in an August 16, 2000 email that discussed "contingency plans in the event redemptions continue to be a problem."  (*Id.*)  At a September 11, 2000 HGI board meeting, it was reported that the Funds had experienced outflows since August of 1999.  (App. 11.)  The Short Duration Fund had an outflow of $66 million ($30 million in 2000), while the High Yield Fund had a net outflow of $22 million ($10 million in 2000).  (*Id.*)

*Mid-September Valuation Assessments.* In September 2000, HAI vice president Kevin Clark tried soliciting bids for bonds directly from "non-traditional" buyers, without using the services of a dealer. (App. 10.) On September 18, Clark reported finding interest very limited, with only "vulture" firms bidding at levels "down 30-50%." (App. 11.) On September 19, co-portfolio manager Thomas Conlin objected that such bids were not in the interest of shareholders. (App. 11-12.) Bauer understood that portfolio managers did not automatically recommend carrying prices based on bids received, but considered various factors, including the source of the bid and the size of the transaction. (App. 11.)

*Validation of Independent Pricing Service.* On September 20, at a meeting of the pricing and credit committees, HAI's COO Paul Beste stated his conclusion that the values being obtained from Muller for NAV calculation remained appropriate. (App. 12.) To reach this conclusion, Beste had earlier in the month (a) met with Muller to evaluate its pricing services; (b) compared Muller's values with values provided by three other pricing sources; and (c) compared the sales prices of all securities sold by the Short Duration Fund with their carrying values and determined that, of 70 sales during 2000, 42 were at a price equal to or better than carrying value, and 28 were at prices between 0.75 and 0.13 basis points lower than carrying values. (App. 9-10.) Following Beste's report, no actions were taken by the pricing committee to override any security prices. (App. 12.)

*September 28th Portfolio Manager Resignation.* Thomas Conlin and Greg Winston were the Funds' co-portfolio managers. (App. 7.) Conlin had 22 years of experience as a

9

municipal bond credit analyst and municipal bond mutual fund portfolio manager. (Dkt. #400 ¶16.)[9]  On September 28, 2000, HAI issued a press release publicly announcing that Conlin had resigned and that his replacement Phil Fiskow had joined the firm.  (App. 14.)  The day before, Bauer sent an email to HAI customer services representatives advising how to respond to anticipated questions from the Funds' shareholders.  (App. 12.)

   *September 28th Price Markdown.*  Also on September 28, 2000, carrying values of many securities in the Funds' portfolios were substantially lower than carrying values the day before.  (App. 14.)  Individual bonds were marked down by Muller by as much as 50%, and this caused the NAV's of the Short Duration Fund and the High Yield Fund to decline by approximately 2% and 8%, respectively.  (*Id.*)  Muller's September 28, 2000 markdown did not cause Bauer to question the carrying values for other bonds owned by the Funds.  (*Id.*)  HAI's COO Beste reported to the pricing committee that Muller said it expected that the markdowns that day would be representative of markdowns of other securities with similar characteristics.  (*Id.*)  The next day, the SEC's Chicago office phoned to inquire about the markdowns, and Bauer provided requested information.[10] (*Id.*)

   *September 29th Sale of Non-Performing Securities.*  On September 29, 2000, the Funds

---

[9] Tab 72.

[10] On October 2, 2000, the day before her redemption, Bauer also faxed two letters to SEC staff providing additional and more detailed information about the Fund's pricing, securities sales and holdings, loan balances and financial condition.  (Dkt. #400 ¶98.)

sold a group of non-performing securities to the State of Wisconsin Investment Board ("SWIB"), using carrying values provided by Muller on September 28, 2000. (App. 13.) SWIB also obtained a "put" from HAI's parent company (HGI) that gave SWIB the right to sell the bonds to that company after two years with a negotiated profit to SWIB. (*Id.*; Dkt. #400 ¶¶79-81.) HAI's and HGI's boards unanimously approved the sale, which allowed HAI to decide which securities it wanted to place in the SWIB transaction and thus remove non-performing bonds from the Funds. (*Id.*) Bauer was not involved in finding a buyer, selecting the bonds to be sold or negotiating the price or other terms of the transaction. She did not view such a transaction as unusual, since HAI had purchased and sold securities in private transactions on previous occasions for the mutual funds it managed. (*Id.*)

*Early October Nonpublic Indicators were Positive.* By the beginning of October 2000, the nonpublic indicators of the Short Duration Fund's core operations and finances known to Bauer were positive and better than before. (Dkt. #400 ¶114)[11] HAI had hired a new portfolio manager, and arrangements had been made for other managers to stay on. HAI's president had indicated that the possibility of selling the Short Duration Fund to another sponsor was not being actively considered. (Dkt. #400 ¶115)[12] The Short Duration Fund's investment in defaulted securities, permitted by the prospectus, had declined from 6.2% to 4.1% of net assets. Illiquid securities as a percentage of assets

---

[11] Tab 19, ¶35.

[12] Tab 4, 262:2-24; Tab 19, ¶36.

also had declined from 10.89% to 8.53%, well below the 15% limit mentioned in the

prospectus.  (Dkt. #400 ¶¶116-118; App. 16.)  Most significantly, the Short Duration

Fund's outstanding borrowings were completely paid off by October 2, 2000, and it

could borrow up to 33% of its assets if it needed liquidity.  The Fund's credit line had

just been renewed in the ordinary course of business.  (Dkt. #400 ¶118.)[13]

### D.  Bauer's Likely Resignation from HAI

By the beginning of October 2000, Bauer expected to shortly resign from HAI and

move to San Francisco to take a new job at Loomis Sayles.  (Dkt.  #400 ¶¶102-03.) By

that time, Bauer already had two in-person interviews, including with its CEO and its

general counsel.  (*Id*.)  Bauer had worked with the general counsel on the board of

governors of the Investment Advisers Association.  During her second interview in

San Francisco, Bauer met with a realtor and looked at houses and schools.  (*Id*.)[14]

Loomis Sayles had already provided Bauer with compensation and benefits

information, including specific information about base salary, bonus, tax-deferred

contribution, moving expenses, and signing bonus.  Bauer had responded that this

package was acceptable to her.  (Dkt. #400 ¶103.)[15]  Bauer then proceeded to schedule a

meeting with Loomis Sayles' east coast legal staff and a final meeting in San Francisco.

Bauer expected to receive a formal offer at the final meeting, but she understood that

---

[13] Tab 19, ¶39; Tab 40, IM00324; Tab 60, HAI015390.

[14] Tab 1, 131:1-133:24; Tab 19, ¶25.

[15] Tab 19, ¶26; Tab 46.

the general counsel already had authority to hire her.  Thus, Bauer believed she would

be resigning shortly and moving to San Francisco.  (Dkt. #400 ¶104.)[16]

Bauer proceeded to make plans to resign from HAI and move to San Francisco.  At

the end of September, she met with a realtor at her home in Wisconsin to discuss listing

it for sale.  (Dkt. #400 ¶105.)[17]

### E.  Opening of the Funds' Transaction Window

On learning in August 2000 that the Funds' co-portfolio manager Thomas Conlin

planned to resign, Bauer, as general counsel, restricted those who knew about the

pending resignation, including herself, from purchasing or redeeming shares of the

funds that Conlin managed.  On the morning of September 28, 2000, when HAI

informed its employees of Conlin's resignation, Bauer expanded the restriction to cover

all HAI employees until the resignation was publicly announced later that day.  (Dkt.

#400 ¶¶94-95.)

After the close of business on September 28th, and after news of Conlin's resignation

had become public, Bauer lifted the restriction on transactions in shares of the Funds.

Importantly, Bauer had informed the Funds' president and board, in the presence of the

Funds' outside counsel (Quarles & Brady) of the decision to lift the restriction.  None of

them objected; nor did they advise or instruct Bauer against lifting the transaction

restriction that day.  (Dkt. #400 ¶96.)

---

[16] Tab 1, 137:1-139:18; Tab 19, ¶27.

[17] Tab 19, ¶28; Tab 47.

Once the transaction window opened late on September 28th, Bauer did not redeem

her shares.  Nor did she do so over the next two business days.  As described below,

Bauer's redemption came fully five days later.

### F.  Bauer's October 3, 2000 Redemption

On October 3, 2000, before going to work, Bauer placed an order over the phone to

redeem her shares in the Short Duration Fund.  Bauer's shares were redeemed at the

NAV determined at the close of that day, and she received net proceeds of $44,267.15.

(App. 16.)  As discussed above, the Fund's NAV price set at the end of the day was used

for all transactions that were consummated that day.  So it is undisputed that Bauer

received the exact same price as every other fund shareholder who redeemed Fund

shares that day.

Bauer had first purchased Short Duration Fund shares in 1998.  (App. 6.)  HAI

management employees were expected to invest in the HGI Funds, and the Short

Duration Fund seemed the most appropriate fund to Bauer given her financial needs

and other investments at that time.  (*Id.*)  The Fund's investment goal was high

tax-exempt current income with low share price fluctuation.  (App. 4.)  It was suggested

for investors with short term investment needs because it sought to minimize share

price fluctuation by maintaining short portfolio duration.  (App. 5.)  These were liquid

assets that Bauer set aside to pay large expenses such as school tuition and property

taxes.  (App. 6.)

Bauer purchased additional Short Duration Fund shares at various times during

1998 and 1999.  (*Id.*)  She did not purchase any shares during 2000, except for a dividend

reinvestment on September 29, 2000.  (*Id*.)  Bauer made a redemption of approximately $11,000 in December 1998.  (Dkt. #400 ¶101.)[18]  She did not make a redemption at the end of 1999, because she then had extra cash available.  (*Id*.)

Bauer redeemed on October 3, 2000 because she believed that, as discussed above, she would soon need to use her savings invested in the Short Duration Fund to finance an employment and life transition.[19]  She knew that the cost of living was much higher in San Francisco than in Milwaukee, and that she likely would have to make a large down payment on a house and possibly carry two mortgages for a period of time.  (Dkt. #400 ¶106.)[20]  She also expected, based on her move from Chicago a few years earlier, that moving expenses could be higher than a reimbursement allowance.  She expected to forfeit her annual 30% bonus, her annual employee retirement contribution, and any non-vested amounts in her retirement account, if she resigned before the end of the year.  (Dkt. #400 ¶107.)[21]

In addition to these personal reasons, based on entirely public information, there was reason for Bauer to make any redemption promptly.  The Short Duration Fund's NAV had declined sharply in 2000, including a decline from $9.27 at the end of June to

---

[18] Tab 19, ¶¶23-24; Tab 49, HAI0088058; Tab 4, 1:18-13:24.

[19] Ultimately, Bauer did not go to work for Loomis Sayles.  At first, her anticipated final visits were postponed because of an announcement that Loomis' parent company was going to be acquired.  Then, when Bauer learned that she was being investigated by the Commission for insider trading, she withdrew her name from consideration.  (Dkt. #400 ¶108; Tab 19, ¶ 31; Tab 1, 134:11-135:9; Tab 3, 374:7-25.)

[20] Tab 19, ¶29.

[21] Tab 19, ¶30.

$8.88 at the end of September.  (App. 15.)  By early October, she was no longer

comfortable with the Fund's price volatility.  (*Id.*)  The Fund's semi-annual report

provided to investors showed that during the six months ending June 30, 2000, the

Short Duration Fund's net assets shrunk by almost 8.2% to approximately $100 million,

compared to $122 million as of December 31, 1999.  (App. 15-16.)  Shares issued during

this period (excluding dividend reinvestment) were approximately 2.9 million, while

shares redeemed exceeded 5.1 million.  (*Id.*)

### G.  Unexpected October 13, 2000 Price Markdown

Phil Fiskow took over as lead portfolio manager of the Funds on Monday, October 2.

(Dkt. #400 ¶120.)[22]  Bauer had not participated in interviewing him, and was not aware

before he started work that his previous investment responsibilities had been

principally at insurance companies, and he had no experience managing mutual funds.

(*Id.* ¶¶20-21.)[23]

Fiskow initially expressed optimism about the Funds in early October.  (*Id.* ¶120.)[24]

However, on Wednesday, October 11 the High-Yield Fund sold a bond for 10% lower

than its carrying value.  (*Id.* ¶121.)[25]  Although this was not out of line in the high-yield

municipal bond business (*Id.* ¶25),[26] Fiskow apparently concluded from this single sale

---

[22] Tab 69, IM06579.

[23] Tab 19, ¶11; Tab 9, 10:4-11:8; Tab 75, F0000.003–F0000.011.

[24] Tab 69, IM06579.

[25] Tab 9, 55:10-56:16.

[26] Tab 21 at 29.

that the market for the bonds held by the Funds had become dysfunctional. (*Id*. ¶122.)[27] Around that time, Fiskow first informed Bauer that he was going to expand the Funds' watch list and illiquid lists considerably. (*Id*. ¶¶123-124.)[28]

At a special board meeting on October 12 called by Bauer for the purpose of discussing these developments, Fiskow characterized the market for both the Short Duration and High Yield Funds' securities as illiquid, and estimated that the Funds' securities may be worth 70% of their carrying value. (Dkt. #400 ¶¶125-126.)[29] The board responded by requesting that SEC staff be contacted to inquire about the possibility of suspending redemptions, and also by directing the pricing committee to establish a fair value for the Funds' portfolio securities. (App. 17-18.)

The pricing committee was unable to conclude on October 12 that there was enough information to deviate from Muller's valuations. (Dkt. #400 ¶¶128-129.)[30] That afternoon, after receiving the daily pricing feed, the pricing committee met with the portfolio managers to consider whether the Muller valuations for the Funds' securities, totaling more than 100 bonds, represented fair values in light of the developments discussed with the board. (App. 18.) After discussing SEC pricing guidance, the HAI Pricing Procedures, various factors and approaches to fair value pricing, and the portfolio managers' assessments of value, the pricing committee determined

---

[27] Tab 4, 208:18-210:5.

[28] Tab 2, 79:13-80:15, 81:3-83:7; Tab 19, ¶41; Tab 38, HAI66376-84.

[29] Tab 38, HAI66376-77, HAI66381-82.

[30] Tab 5, 90:5-91:8; Tab 2, 222:1-223:9; Tab 33, HAI015763.

unanimously that there was not enough information to conclude that Muller's valuations did not represent fair values, and therefore Muller's valuations should be used that day.  (*Id*.)

The next day, however, the pricing committee decided to fair value the Funds' bonds using a novel, multi-step process.  The first step was a "fair value" judgment by the portfolio managers, using Muller values and other criteria.  (Dkt. #400 ¶135.)[31]  This step was contemplated by the Funds' pricing procedures.  However, the pricing committee then applied an across-the-board "haircut" to these estimates of current values, reducing the total value of the High-Yield Fund by approximately 50%, and the Short Duration Fund by approximately 33%.  (Dkt. #400 ¶136; App. 19.)[32]

The haircut approach was a novel process, which the pricing committee employed notwithstanding concerns expressed by portfolio managers.  (App. 19.)  Bauer did not participate in devising the haircut and did not vote on its use.   (App. 18.)  She was otherwise occupied most of the day.  To Bauer's knowledge, this approach had never been used by these Funds or any other mutual fund.  (*Id*.)

Later, the Funds' auditor would not complete its 2000 audit of the Funds because it saw no basis for the October 13 haircut markdown, which it believed could not be supported.  (Dkt. #400 ¶145.)[33]  And the SEC has alleged that the October 13 process was improper, the prices resulting from the haircut did not represent fair value, and the

---

[31] Tab 22, ¶70; Tab 34, HAI015759.

[32] Tab 22, ¶70; Tab 34, HAI0157760.

[33] Tab 19, ¶44.

18

Funds' NAV's were materially understated from that time until the liquidation.  (Dkt. #283 ¶¶71-73.)

## SUMMARY OF ARGUMENT

The district court erred in denying Bauer's motion for summary judgment and in granting summary judgment to the SEC.  As set forth in Section I of the Argument, Bauer's motion for summary judgment should have been granted because extending insider trading liability to mutual fund redemptions is erroneous as a matter of law - it is not supported by the well-established "disclose or abstain" model because the price for mutual fund shares are not determined by information in the markets.

Assuming, *arguendo*, redemptions in mutual fund shares are subject to insider trading doctrine under certain circumstances, as set forth in Sections II and III of the Argument, the district court erred in granting the SEC summary judgment because, with respect the fact-intensive elements of materiality and scienter, the district court improperly weighed the evidence, chose among the parties' competing inferences, and otherwise displaced the province of the jury.

## STANDARD OF REVIEW

As to the first issue, this Court reviews *de novo* the district court's legal determination respecting the imposition of insider trading liability for a mutual fund redemption, which appears to be a legal question of first impression.  *Bennett v. Local Union No. 66*, 958 F.2d 1429, 1434 (7th Cir. 1992).  As to Points II and III below, this Court reviews the district court's grant of summary judgment *de novo*.  *Harley-Davidson Motor Co. v. PowerSports, Inc.*, 319 F.3d 973, 980 (7th Cir. 2003).

On summary judgment, a movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he party opposing the motion gets the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 314 (7th Cir. 2011). And a court must "constru[e] all inferences in favor of the party" opposing the motion. *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 925 (7th Cir. 2011).

"Summary judgment is not appropriate if the court must make a choice of inference" arising from undisputed facts. *Harley-Davidson Motor Co.*, 319 F.3d at 989 (internal quotation omitted). Rather, the "choice between reasonable inferences from facts is a function of a fact-finder, and when multiple reasonable inferences exist on a genuine issue of material fact, summary judgment will not be appropriate." *Id.* Moreover, the court cannot decide the credibility of witnesses or weigh the evidence in deciding a summary judgment motion, as these are tasks for the trier of fact. *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 627 (7th Cir. 2006).

## ARGUMENT

I. **The District Court Erred in Denying Bauer's Motion for Summary Judgment Because Insider Trading Liability Should Not Apply as a Matter of Law to Mutual Fund Redemptions.**

The SEC has multiple statutory and regulatory tools and remedies at its disposal to deal with how mutual funds and their professionals operate, with how funds price their shares, and with how funds keep records and report to investors. In the present case the SEC has put these many tools aside and is asserting only an insider trading claim

against Bauer.  The SEC voluntarily dismissed "with prejudice" "the allegations and charges made against" Bauer "that the Court did not address in" its decision "on the insider trading claim."  (Dkt. #460.)  The district court confirmed that all counts were "dismissed with prejudice" with the exception of claims "relating solely to Bauer's insider trading as discussed in" its summary judgment decision now on appeal.  (App. 45.)

With the SEC's claim thus circumscribed, this Court will have the opportunity to consider and determine in a clear and simple context an important question of first impression under the federal securities laws.  The lower court's decision appears to represent the first time in the SEC's 78-year history that any federal court has ever imposed insider trading liability for an open-end mutual fund redemption. [34]  It goes without saying that the answer to this question is important for the fund industry, for thousands of fund professionals and service providers, and for Bauer personally.

For the following five reasons, imposing insider trading liability for open-end mutual fund redemptions would be at odds with five decades of judicial analysis:  **(a)** in a mutual fund redemption there is always a fully-informed counterparty (the fund) and

---

[34] Based on our research and the SEC's briefs below, no federal court has so held.  An SEC administrative law judge found insider trading in mutual funds in an agency proceeding in which the respondent appeared *pro se*.  There is no indication in the ALJ's decision that either side alerted him to the novelty of the claim.  *David W. Baldt*, SEC Release No. 418, 2011 WL 1506757 (ALJ Apr. 21, 2011).  In another matter, the SEC and a defendant reached a no-admission settlement in a case charging insider trading in mutual fund shares.  However, based on the SEC's release there is no indication the court entering the consent decree considered the issue or that the SEC advised the court of its novelty.  *S.E.C. v. Marquardt*, SEC Litig. Release No. 21383, 2010 WL 191749 (Jan. 20, 2010).

no "deception" by the insider of "shareholders with whom the insider transacts" or "contemporaneous traders" that would trigger the "disclose or abstain" duty; **(b)** in a fund redemption the price is derived by aggregating the value of all securities held in the fund's portfolio, and information about many different portfolio companies is what drives fund price, not information about the fund itself; **(c)** in a fund redemption there is no concealment of information from a trading market that needs the information to fairly price the security; **(d)** fund employees who want to redeem fund shares for ordinary living expenses should not, under any known interpretation of insider trading case law, have to second-guess complex NAV determinations before redeeming; and **(e)** the SEC has explicitly recognized, in issuing its rule governing trading by mutual fund insiders, that mutual fund shares in general "present very little opportunity for ... improper trading."

As discussed in more detail below, there is no need to turn a half-century of carefully developed and articulated insider trading precedent on its head to try to fit a perceived need already filled by existing statutes and rules governing the conduct of mutual funds and their professionals.

**A. In Mutual Fund Redemptions There Is No "Deception" of "Shareholders with Whom the Insider Transacts" That Would Trigger the "Disclose or Abstain" Duty.**

The law of insider trading has evolved through precedent over the last fifty years in connection with insiders' market purchases and sales of publicly-traded securities. So-called "classical" insider trading theory "targets a corporate insider's breach of duty to shareholders with whom the insider transacts" – *i.e.* the insider's trading

counterparties.  *United States v. O'Hagan*, 521 U.S. 642, 652 (1997); *see also* 15 U.S.C.

§ 78t-1 (liability to "contemporaneous traders" in private action for insider trading).

And the insider's breach of duty to counterparties or contemporaneous traders must

involve "deception," as the statutory fraud proscription "is not an all-purpose breach of

fiduciary duty ban; rather, it trains on conduct involving manipulation or deception."

*O'Hagan* at 655, citing *Santa Fe Indus. v. Green*, 430 U.S. 462, 473-76 (1977).

The SEC and the courts have defined the insider's duty to avoid deception of trading

counterparties as the duty to "disclose or abstain" – *i.e.* either disclose the information

to "shareholders with whom the insider transacts," or else simply abstain from trading.

*O'Hagan*, 521 U.S. at 652 .  This articulation of the duty dates back to the very first

insider trading case, a 1961 SEC administrative proceeding involving an independent

director who tipped a colleague about an impending dividend cut.  The colleague

immediately directed sales of the company's common stock before the market could

learn the information and reprice the shares.  *Cady, Roberts & Co.*, 40 S.E.C. 907, 1961 WL

60638 (Nov. 8, 1961).  In its decision, the SEC noted the "inherent unfairness" where an

insider trades on information "knowing it is unavailable to those with whom he is

dealing," and adopted the now well-established "disclose or abstain" principle in

holding that, where a corporate insider has material nonpublic information, "any sales

by the insider must await disclosure of the information."  *Id*. at *4-5.

The Supreme Court, first in *Chiarella v. United States*, 445 U.S. 222 (1980) and in all

pronouncements since, has endorsed the SEC's *Cady Roberts* approach and expressly

confirmed that corporate insiders have an obligation to "disclose or abstain" from

23

market trading when in possession of material nonpublic information. *Id.* at 232-33; *see also O'Hagan*, 521 U.S. at 652; *Dirks v. S.E.C.*, 463 U.S. 646, 659 (1983).

In the mutual fund context, there is no trading market, and all shares must be redeemed by (sold to) the issuer itself. Thus, when the Fund redeemed Bauer's shares on October 3, 2000, the Fund was not only Bauer's direct counterparty, it was effectively the entire "market" (or the only "contemporaneous trader"), as it was the only allowable purchaser for the Fund shares Bauer was redeeming.

The Fund was not "deceived" by Bauer. The Fund, acting through its board and management, had available all of the information available to Bauer, and indeed the Fund had available considerably more information than what Bauer had. There is no allegation that Bauer deceptively withheld any information from the Fund's management at the time it redeemed her shares. Indeed, the SEC has issued an administrative order publicly admitting that the Fund's management already knew the same information about the Fund that the district court found Bauer possessed. *See John D. Hammes*, SEC Release No. 8346, 2003 WL 22926836, at *2-7 (Dec. 11, 2003).

Nor did Bauer "deceive" Fund investors – whether pre-existing Fund investors or new investors purchasing Fund shares. Even if the Fund had redeemed Bauer's shares at a hypothetically incorrect price, it was at a price set based on determinations by the Fund's independent pricing service, portfolio managers and pricing committee – not through "deception" by Bauer. Further, the SEC has admitted that the Fund and its

personnel acted, at most, "negligently" in setting its prices during the relevant period, including the prices the Fund used to redeem Bauer's shares. [35]

### B. In Fund Redemptions Pricing Is Derivative, Based on Prices of Multiple Portfolio Securities, and Not Based on Information About the Fund.

A mutual fund's share price is derived from an aggregation of the value of other and different securities that are held in the fund's portfolio. Specifically, as required by SEC Rule 22c-1(a), 17 C.F.R. § 270.22c-1(a), mutual fund shares are priced at the end of each day by calculating the fund's NAV – a mathematical computation of the values of all of the securities held in the fund's portfolio. All investors who purchased shares from the fund or redeemed shares to the fund that day get the exact same asset-based price. As the court recently explained in *S.E.C. v. Pentagon Capital Management PLC*, 844 F.Supp.2d 377, 383-84 (S.D.N.Y. 2012):

> "The [fund] managers (or their agents) generally set the deposit and redemption price at their best estimate of the value of a share in the mutual fund, which is called the fund's net asset value (NAV). The aggregate net asset value of the fund is the total value of the fund's assets, less any liabilities that the fund may have. Funds compute their NAV by dividing the aggregate net asset value by the total number of mutual fund shares outstanding.
>
> …

---

[35] After years of investigation and litigation discovery, the SEC on January 25, 2008 issued official public "findings" settling this matter as to all remaining defendants except Bauer. (Dkt. #391) These SEC findings – admissions under Federal Rule of Evidence 801(d)(2) – admitted that any alleged mispricing of Fund shares resulted from merely "negligent" conduct. Specifically, the SEC found that "[a]s a result of ... negligent conduct ..., Heartland Advisors did not properly fair value the bonds held by the Funds. As a result of ... negligent conduct ..., the NAV of each of the Funds was materially overstated from March 1, 2000 to October 13, 2000." (Dkt. #391 at 8-9.)

> "Deposit (investor purchase) and redemption (investor sale)
> transactions in open-end mutual funds are always executed after the
> normal closing time of the stock and bond markets.  In general, traders
> must place their orders before 4:00 PM Eastern Time.  The fund's NAV is
> generally computed from last trade prices recorded as of 4:00 PM Eastern
> Time.  If the fund managers believe that the last observed price of a
> security held by the fund does not fairly represent its current value, the
> managers may specify a different price.  This process is called fair
> valuation."

*Id.* (endorsing and quoting an expert report describing mutual funds).

With a mutual fund's share price based on such a computation of the values of the
multiple securities held in the fund's portfolio, a mutual fund is more analogous to a
derivative or an index in that the fund's own share price depends on how other
securities are trading.  This means that the "information" that drives share price is
information relating to the underlying portfolio companies whose own shares are
actually market priced (or otherwise valued) based on available information about
those companies, and not information pertaining to the fund.

### C.  In Fund Redemptions There Is No Concealment from a Trading Market of Information Needed to Fairly Price the Security.

Another foundational element of insider trading liability is that it involves trading
where the market is deprived of information that the market needs in order to fairly
price the security.  Insider trading constitutes securities fraud because a company
insider may possess information that the market does not possess and, once disclosed to
the market, the price of the security will be affected.  The insider can profit by trading in
the security before disclosure of the information has the anticipated effect on the price.
As the court observed in *S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968):

26

> An insider is not, of course, always foreclosed from investing in his own
> company merely because he may be more familiar with company
> operations than are outside investors.  An insider's duty to disclose
> information or his duty to abstain from dealing in his company's securities
> arises only in those situations which are essentially extraordinary in
> nature and which are reasonably certain to have a substantial effect on the
> market price of the security if … disclosed.

*Id.* at 848 (internal quotation omitted).

The market does not price mutual fund shares based on information available to the market.  Indeed, the market does not price mutual fund shares at all.  Instead, as described above, a fund's NAV pricing is determined by valuing the many securities in its portfolio and then arithmetically arriving at a price for each fund share.  *See* Mercer E. Bullard, *Insider Trading in Mutual Funds*, 84 Ore. L. Rev. 821, 839 (2005) ("Mutual fund shares are not traded in a secondary market in which new information might affect the price of the security [and] there can be no inside information that, if publicly disclosed, would affect the fund's price").

"Disclosure" of information about a mutual fund to the market has no effect on its share price, which is simply a computation of the value of the fund's underlying portfolio.  All shares redeemed on any given day are priced after the market closes based on a determination of the NAV of the fund's portfolio, and not based on information available in a trading market.

Thus, if Bauer had disclosed every scrap of information about the Short Duration Fund cited in the district court's opinion on the morning of October 3, 2000, she would still have gotten the exact same price for her Fund shares as every single person purchasing or redeeming that day – the NAV price set at the end of the day.

27

### D. In Redeeming Their Fund Shares the Fund's Employees Cannot Reasonably Be Expected to Second-Guess Its Valuation Determinations.

Setting an NAV price can be a complex task, as a fund's portfolio may involve many different securities, some of which may be illiquid or have no readily available market quotations. The NAV price setting activity may, as here, involve reliance on an independent pricing service as well as the judgment of the portfolio manager and other securities professionals trained as securities analysts, plus advice of counsel and board oversight.

Fund employees are often, as here, strongly encouraged to invest their personal assets in their employer's funds. These employees may in the course of any day see emails or attend meetings where fund personnel express optimism or pessimism about the economy, the markets, the fund's portfolio companies, or various fund operational issues. But when they purchase or redeem fund shares – whether to pay monthly credit card bills or larger expenses like buying a car – they should not be expected to second-guess each day's NAV calculation. They should not be put in constant jeopardy of insider trading liability whenever they add to or withdraw money from their personal fund investments at the NAV price the fund itself determines.

This is obviously not to say fund employees should be exempt from liability if they use inside information to trade one of the underlying portfolio stocks. Plainly, a mutual fund employee who obtains material nonpublic information about a portfolio company should not be allowed to exploit that information through personal trading in that company's market-traded securities. Nor should a mutual fund portfolio manager be allowed

28

to use inside information to buy or sell stock for the fund's portfolio.  In such situations the fund employee is taking advantage of confidential information that may impact the price of a publicly traded security once it becomes known to the trading market that sets the price.

For this reason, fund advisers adopt and maintain insider trading "policies." However consistent with SEC Rule 17j-1, 17 C.F.R. § 270.17j-1, discussed below, such policies should not be read to restrict purchases or redemptions of shares of the fund itself or the shares of other open-end mutual funds.

The SEC has pursued an aggressive insider trading enforcement program, *e.g. Baldt*, 2011 WL 1506757.  And as discussed above, its applicability to mutual funds has never before been adjudicated.  In such an uncertain world, it is not surprising that some fund advisers have gone beyond what has to date been required and, like public companies, deployed fund transaction "windows" to restrict employees from purchasing or redeeming even the fund's own shares during particular periods.

Funds may close or open the window for reasons that have nothing to do with the NAV pricing of fund shares.  In the present case, for example, the window for the Short Duration Fund had been closed until HAI publicly announced the resignation of a well-regarded co-portfolio manager and the appointment of a new manager.  Bauer then waited until five days after reopening the window before redeeming her shares.

**E. Congress and the SEC Have Recognized That Mutual Fund Transactions Inherently Do Not Present Risks of Improper Trading Activity.**

In 1970, Congress added Section 17(j) to the Investment Company Act, 15 U.S.C. § 80a-17(j), to give the SEC authority to issue rules forbidding mutual fund insiders from using inside information to buy or sell securities. *See* Investment Company Act of 1940 amendments, title VI, sec. 612, 84 Stat. 1420 (1970) (codified as amended at 15 U.S.C. § 80a-17(j)). In so doing, Congress could have granted the SEC authority over all transactions by mutual fund insiders, including purchases and redemptions of their own fund's shares, but it did not do so. Instead, Congress limited the SEC's authority to transactions by fund insiders in securities of companies held in their fund's portfolio or contemplated for purchase by their fund. *See* S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4923 (new provision "would prohibit insider trading in securities held or to be acquired by" a mutual fund).

Ten years later, the SEC finally used this authority and adopted Rule 17j-1, 17 C.F.R. § 270.17j-1, to prohibit fund and adviser affiliates from engaging in fraudulent conduct in buying or selling portfolio securities. The SEC could have had its new rule cover buying and selling portfolio securities that were shares in open-end mutual funds, as fund portfolios can and sometimes do invest in shares of other funds. But the SEC chose not to do so. Instead, subsection (a)(4) of the rule explicitly states that the SEC rule does not cover purchases or sales of "shares issued by open-end funds." 17 C.F.R. § 270.17j-1(a)(4).

In its release adopting Rule 17j-1, the SEC recounted how its original proposal for the rule did not exempt trading in open-end mutual funds. *See Prevention of Certain Unlawful Activities with Respect to Registered Investment Companies*, SEC Rel. IC-11421, 45 Fed. Reg. 73,915, 73,919 (Nov. 7, 1980). Commentators suggested that mutual funds also be exempted, and the SEC agreed. *Id.* The SEC stated in the adopting release:

> [T]he term "security" was [initially] defined to except only securities issued by the United States government. Several commentators suggested that the exception ... should be expanded to include all ... shares of open-end investment companies. Commentators argued that these securities do not present an opportunity for profiting at the expense of an investment company.
>
> After analyzing the comments ..., *the Commission has concluded that ... shares of open-end investment companies present very little opportunity for the type of improper trading that the Rule is intended to cover.* The exceptions ... have, therefore, been expanded to include ... shares of open-end investment companies.

*Id.* (emphasis added).

So in enacting a statute to control insider trading by mutual fund employees, Congress specified that it should apply just to portfolio securities, and not to shares of the employees' own mutual fund. And in then adopting its implementing rule, the SEC took the additional step of specifying that the prohibition on misuse of inside information applied only to shares of public companies in the fund's portfolio (or contemplated for purchase for the fund's portfolio), and not to shares of open-end mutual funds in the fund's portfolio. As discussed above, this makes sense because inside information about the publicly-traded companies in the portfolio could impact the price of those companies' shares in their information-driven trading markets. But

31

inside information about an open-end mutual fund itself does not impact the price of

fund shares, as fund shares are priced simply through the fund's NAV calculation at the

close of each day.[36]

II.    **Assuming, *Arguendo*, That Insider Trading Liability Can Be Extended to
Mutual Fund Redemptions, the District Court Erred in Granting the SEC
Summary Judgment on the Highly Fact-Specific Issue of Materiality.**

The Supreme Court has made clear that the question of materiality is "an inherently

fact-specific finding." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309 (2011), quoting

*Basic Inc. v. Levinson*,  485 U.S. 224 (1988).  Making a materiality determination usually

involves the "delicate" weighing of inferences; assessments that are "peculiarly ones for

the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976); *Basic*,

485 U.S. at 236.  That is because information is only material if there is "*substantial*

*likelihood* that the disclosure of the omitted fact would have been viewed by the

*reasonable investor* as having *significantly altered* the '*total mix*' of information made

available.'" *Basic*,  485 U.S. at 231-32, quoting *TSC Indus.*, 426 U.S. at 449 (emphasis

added).

---

[36] Notably, the SEC included certain mutual fund shares in its rule covering transaction
reporting by fund adviser personnel (Rule 204A-1) even though it had excluded all mutual fund
shares from its rule covering insider trading by fund and adviser personnel (Rule 17j-1)
previously.  In 2004, the SEC issued Rule 204A-1(b) to require investment adviser personnel to
file reports with their employer listing their securities transactions and holdings.
17 C.F.R. § 275.204A-1(b)(2) .  The rule specified that the adviser's employees did not have to
report "Shares issued by open-end funds" (mutual funds) *unless* the funds were "reportable
funds." *Id.* at § 275.204A-1(e)(10)(iv).  In turn, the rule defines a "reportable fund" as a fund for
which a person serves as adviser or for which the person is controlled by the fund's adviser.  *Id.*
at § 275.204A-1(e)(9).  Even though some transactions in fund shares must be reported, all
mutual fund shares remain exempt from Rule 17j-1 trading prohibitions.

The district court acknowledged this general standard (App. 24), but then erroneously displaced the function of the jury by weighing the evidence and selecting among competing inferences. In granting summary judgment, the district court *did not* conclude that there was "no genuine dispute" – the Rule 56(a) standard for summary judgment – with respect to the required materiality element. Instead, the district court said simply that "[t]he court doubts that reasonable minds could disagree whether the information Bauer possessed was material." (App. 32.)

The district court erred in its materiality assessment in three ways. First, a jury could reasonably conclude that the various categories of nonpublic information unrelated to the price of the Short Duration Fund do not meet the legal standard for materiality in insider trading cases. Second, the district court - like the SEC in its briefs below - disregarded the total mix of information about the Fund that was contained in its public filings and the financial press. Viewing this evidence in a light most favorable to Bauer - as the district court should have done - a jury could reasonably conclude that the additional information about Fund operations was immaterial. Third, the district court overlooked the evidence of the positive developments in the operations of the Short Duration Fund in the days leading up to Bauer's redemption. The evidence of improved conditions in the Fund's liquidity, redemptions, borrowing, and defaulted securities is part of the "total mix" of information, and a jury could reasonably conclude that older, more negative information was stale and immaterial at the time of Bauer's redemption.

**A.  A Jury Should Be Permitted to Determine Whether Nonpublic Information Unrelated to the Price of the Short Duration Fund Was Material.**

Whether the nonpublic information Bauer possessed was material should be viewed in the context of the SEC's insider trading claim involving an open-end mutual fund. As set forth in Section I.C., *supra*, the insider trading prohibition is meant to prevent an insider from capitalizing on nonpublic information which, if disclosed, would have a substantial effect on the market price of the security.  Thus, as established in the seminal *Texas Gulf Sulphur* case, information that is not reasonably certain to have a substantial effect on the market price of the security is not *material* nonpublic information.  401 F.2d at 848; s*ee also Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156 (2d Cir. 1980) (citation omitted) (alleged tip was immaterial because the information was "not reasonably certain to have a substantial effect on the market price" of the stock); Donald C. Langevoort, 18 *Insider Trading: Regulation, Enforcement, & Prevention* § 5:2 ("for insider trading purposes … information the disclosure of which would be likely to result in a substantial change in the price of the security" is material); Bullard, *supra*, 84 Ore. L. Rev. at 839.

Moreover, courts have found that undisclosed information about the operations of mutual funds is typically not material because it does not relate to the price of the fund. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010); *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1188 (N.D. Cal. 2004) (stating "the share price of a mutual fund is not affected by alleged misrepresentations or omissions" about the fund because the fund's price "is determined by the value of all underlying

34

securities it holds at a given time"); *Yu v. State St. Corp.*, 686 F. Supp. 2d 369, 379-80

(S.D.N.Y. 2010) (dismissing complaint where plaintiff failed to show how or why the

securities in the fund, and the fund itself, were over-valued) *reconsideration granted on*

*other grounds by Yu v. State St. Corp.*, 2010 WL 2816259 (S.D.N.Y. July 14, 2010).

The Seventh Circuit has similarly concluded, in cases not involving either insider

trading or mutual funds, that omitted information must generally relate to the price of

the security in order to be material.  *See S.E.C. v. Jakubowski*, 150 F.3d 675 (7th Cir. 1998)

(emphasizing that "[u]sually price (or facts that influence price) is all that matters to

securities transactions"); *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931

(7th Cir. 1988).[37]

In this case, the district court set forth seven categories of nonpublic information that

it believed Bauer possessed at the time of her October 3 redemption in the Short

Duration Fund:  (1) the Fund was "experiencing liquidity problems;" (2) there were

"concerns regarding credit"; (3) the Fund had received bids on some securities in the

portfolio at "distressed prices"; (4) redemptions in the Fund were "worrisome"; (5) Bauer

knew details of the SWIB transaction; (6) Bauer had information about securities on the

---

[37] The *Jakubowski* court affirmed a district court's conclusion that non-price information was
material in the context of that case.  There, Jakubowski falsified stock subscription agreements
in order to participate in an initial stock offering of a bank.  *Id.* at 677-78.  Jakubowski was not
entitled to participate, so he obtained straw buyers in whose name he purchased the stock,
falsifying documents and misrepresenting to the seller (the bank) that the purchase was made
solely for the account of the straw buyer.  *Id.*  It was undisputed that the shares would not have
been sold to Jakubowski's straw buyer at all had the bank known the true facts - other laws
prohibited the bank from selling shares to Jakubowski.  *Id.* at 680.

then-current "watch" list; (7) the potential sale of the Fund to another entity had at least been discussed.  (App. 25.)

A jury could reasonably conclude that none of this information was material because it related to the internal operations of the Fund and its advisor rather than to the value of the Fund.  In concluding that it could grant summary judgment on materiality, the district court overlooked a critical and undisputed fact.  None of the factors listed in HAI's Pricing Procedures related to attributes of the mutual fund itself, such as loan balances and redemption activity.  All of the factors used in setting the NAV price for all fund share transactions each were characteristics of the *individual* securities that made up the Fund's portfolio.  (Dkt. #400 ¶39.)[38]  For this reason, the information cited by the district court did not have an impact on fund share NAV pricing, and hence a jury could reasonably conclude was immaterial to a reasonable fund investor in deciding to purchase or redeem Fund shares.

### B. Even with Respect to the Categories of Nonpublic Information Irrelevant to the Price of the Short Duration Fund, the District Court Erred by Failing to View the Evidence in a Light Most Favorable to Bauer.

Although the district court erred as an initial matter in concluding that nonpublic information unrelated to price was material as a matter of law, the court compounded this error by acknowledging evidence favorable to both parties, but viewing the evidence and adopting inferences favorable to the SEC, the non-moving party.

---

[38] Tab 45, HAI031152-57 (Section IV.D.).

36

*Portfolio Credit Risk.* After setting forth the seven categories of information, the district court first cited internal discussions at Heartland concerning credit issues in connection with defaulted and watch list securities. (App. 25.) However, the court acknowledged the countervailing evidence that the Fund's trend was actually improving: (a) defaulted securities held by the Fund had "declined from 6.2% to 4.1% of net assets" by the end of September, 2000 (b) "illiquid securities as a percentage of assets declined from 10.89% on September 27, 2000, to 8.53% on September 30, 2000." (c) "This was well below the 15% limit for illiquid securities objective mentioned in the prospectus." (App. 16.)

*Likelihood of Redemptions.* The district court next cited internal Heartland discussion concerning redemptions and whether they should be limited. (App. 25-26.) However, the court also noted the countervailing evidence that the Fund's redemptions were no secret. Citing HAI's publicly-available July 1, 2000 Semi-Annual Value Report, the court observed the following public information about redemptions: (a) The Short Duration Fund's assets had shrunk as redemptions exceeded purchases, i.e. there were "net" redemptions. (b) The published report showed that during the six month period ending June 30, 2000, the Fund's net assets declined by about $22 million, or 8.2% (c) The published report also showed that, over the same period, investors redeemed over 5.1 million shares and purchased only 2.9 million. (App. 15-16.)

*Declining Portfolio Valuation.* The district court also referred to internal discussion concerning Fund liquidity and whether portfolio securities should be discounted to stimulate their sales. (App. 27.) However, the court acknowledged the countervailing

evidence that, in the weeks leading up to Bauer's redemption, both the Fund's portfolio manager and its pricing committee rejected this approach (App. 9-12): (a) The portfolio manager, Conlin, objected to efforts to mark down bonds for quick sale at prices that he believed were not in the interest of shareholders (App. 11-12). (b) Portfolio managers did not automatically recommend carrying prices based on bids received, but considered various factors, including the source of the bid and the size of the transaction (App. 11). (c) After discussing all known information on credit issues, the pricing and credit committees concluded that values remained appropriate and took no action on any security prices (App. 12).

As to liquidity, there are the additional facts that the Short Duration Fund's outstanding borrowings were completely paid off as of October 2, 2000, that its prospectus permitted it to borrow up to 33% of its assets, and that the Fund's credit line had just been renewed without change in collateral requirements or other terms. (Dkt. #400 ¶118.)[39]

*Merger or Sale.* Finally, the district court noted internal Heartland discussion concerning whether the Fund should be merged or sold to another fund sponsor. (App. 28.) However, the court also noted - but apparently dismissed as not credible - Bauer's testimony that HAI was not actively trying to find a buyer for the Funds in late September. (App. 28 n.8.) Additionally, the record shows that the Funds' president had

---

[39] Tab 19, ¶39; Tab 40, IM00324; Tab 60, HAI015390.

38

indicated that the possibility of selling the Short Duration Fund to another sponsor was not being actively considered.  (Dkt. #400 ¶115.)[40]

Thus, the evidence shows that the court's enumerated topics were not material, and particular points relied on by the court are contradicted by other evidence in the record.

### C. The District Court Failed to Grant Bauer Favorable Inferences from the Undisputed Facts Showing the Potentially Negative Information Was Already Public.

The district court also erred because a reasonable jury could conclude that, in light of the disclosures in the Fund's public filings and reports in the financial press, none of the information about the operation of the Fund "significantly altered" the "total mix" of information available to investors.

When Bauer redeemed her Short Duration Fund shares on October 3, 2000, information about the Fund's difficulties and risks was already public.  As noted above, the Fund's public filings contained information about the Fund's net redemptions, illiquid securities, NAV declines, and outflow of money from the Fund.  A jury could conclude that the internal discussions did not significantly alter the picture previously disclosed by the Fund.

Indeed, in the days leading up to Bauer's redemption, the financial press essentially reached this conclusion, highlighting various negative aspects of the Fund.  The day after the Fund's September 28, 2000 NAV decline and announcement that experienced and respected co-portfolio manager, Thomas Conlin, had resigned (App. 14),

---

[40] Tab 4, 262:2-24; Tab 19, ¶36.

Morningstar – a leading global provider of independent investment research – reported that the Fund had just "tanked," and noted that the Fund ranked "dead last" in its category for 2000.[41]  (Dkt. #427 ¶184)[42]

Also on September 29, 2000, four days before Bauer redeemed, Bloomberg – a leading global provider of online financial news and analysis – reported on the risky nature of the Fund's high yield bonds, the difficulty in valuing the bonds, *and the potential for further NAV declines in the Fund*.  (Dkt. #427 ¶183)[43]

On October 3, 2000, the morning Bauer redeemed, the Bond Buyer – the daily newspaper of public finance – published a veritable catalogue of the then publicly-known risks of investing in the Fund:

- that the Fund's performance "ranks at the bottom among firms followed by Morningstar";

- that the Fund's situation "highlights the difficult nature of managing high-yield funds – especially ones with a high percentage of health care investments";

- that the Fund's price drop five days earlier was "not such a surprise" because "pricing such issues is difficult since borrowers have hard-to-quantify credit strengths and risks that analysts, pricing agencies, and portfolio managers may evaluate differently";

- that prices for the Fund's high-yield securities "fluctuate more greatly based on market conditions – such as the number of buyers in the market";

- that the Fund, like others, simply adopted prices set by independent pricing agencies;

---

[41] These events were also not lost on the SEC; they provoked a call from the SEC staff to ask what was happening.  (Dkt. #400, ¶¶83-85.)

[42] Supp. Tab CC.

[43] Supp. Tab Y.

- that the Fund was "buried" by its own poor investment selections.

(Dkt. #427 ¶185)[44]

In sum, by the time of Bauer's redemption, internal discussions concerning the Fund had been overtaken by a barrage of highly negative press.  By that date, the market knew from Bloomberg, Morningstar, Bond Buyer and other financial media:  (i) that the Fund's co-portfolio manager had resigned five days earlier; (ii) that the Fund had suffered a substantial NAV drop; (iii) that the Fund's high-yield bond portfolio was risky and difficult to value; (iv) that the Fund could suffer further NAV declines; and (v) that the Fund was burdened by its poor investment selections and ranked last among funds in its category.

### D. The District Court Failed to Grant Bauer Favorable Inferences from the Undisputed Facts Showing the Nonpublic Information at the Time of Her Redemption Was Positive, Rendering Earlier Negative Information Immaterial.

By the beginning of October 2000, the evidence shows that the Short Duration Fund's nonpublic indicators known to Bauer were positive and better than before.  (Dkt. #400 ¶114.)[45]  These nonpublic indicators included the following:

- HAI had hired a new portfolio manager, and arrangements had been made for other managers to stay on.  (Dkt. #400 ¶115.)[46]

- The Funds' president had indicated that the possibility of selling the Short Duration Fund to another sponsor was not being actively considered.  (*Id*.)

---

[44] Supp. Tab EE.

[45] Tab 19, ¶35.

[46] Tab 4, 262:2-24; Tab 19, ¶36.

- The Short Duration Fund's investment in defaulted securities, permitted by the prospectus, had declined from 6.2% to 4.1% of net assets. (App. 16.)

- Its illiquid securities as a percentage of assets also had declined from 10.89% to 8.53%, well below the 15% limit mentioned in the prospectus. (*Id*.)

- The Short Duration Fund's outstanding borrowings were completely paid off as of October 2, 2000, the day before Bauer redeemed her Fund shares. (Dkt. #400 ¶118.)[47]

- With its borrowings thus paid off in full, if the Fund at any point in the future needed liquidity, its prospectus permitted it to borrow up to 33% of its assets. (*Id*.)

- The Fund's credit line had just been renewed in the ordinary course of business, without the bank imposing any change in collateral requirements or other terms. (*Id*.)

In addition, just two weeks earlier on September 20, 2000, HAI's COO Paul Beste reported internally his conclusion that the values being obtained from Muller, the independent pricing service, for NAV calculation remained appropriate. Beste had done an analysis that involved (a) meeting with Muller to evaluate its pricing services; (b) comparing Muller's values with values from three other pricing sources; and (c) comparing the Short Duration Fund's sales prices with carrying values, and thereby finding that, of 70 sales during 2000, 42 were at a price equal to or better than carrying value, and 28 were at prices between 0.75 and 0.13 basis points lower than carrying values. (App. 9-10.)

_____

[47] Tab 19, ¶39; Tab 40, IM00324; Tab 60, HAI015390.

The district court acknowledged this evidence, but then failed to give it any weight - as a jury would be entitled to do - when it stated that the "test for materiality does not require that the information be adverse." (App. 31.)  Evidence that the Fund's liquidity, borrowing ability, and credit quality had all improved supports the inference that the earlier negative information relied upon by the district court did not significantly alter the total mix of information.  Moreover, the court's statement that positive information is irrelevant ignores the fundamental purpose of the insider trading prohibition - preventing an insider from selling ahead of the disclosure of negative information.

### E.  Bauer Could Not Foretell the October 13 "Haircut," Which Is the Only Potential Nonpublic Information in the Record That Had an Effect on the Short Duration Fund's Price.

On October 13th – ten days *after* Bauer redeemed her shares – the Fund substantially changed its methodology for calculating its NAV.  The following evidence shows that, when she redeemed on October 3rd, Bauer did not possess material nonpublic information about this future event.

(1)  At its September 28th meeting, the Fund's pricing committee determined that it was appropriate to continue to use the values obtained from the Fund's independent pricing service.  The pricing committee never expressed the view that the Fund should override the values provided by the pricing service, either wholesale or even on a substantial number of bonds, through the time Bauer redeemed on October 3rd.   (Dkt. #400 ¶¶75-77, 87; Dkt. #426 ¶¶220, 248, 258.)

(2)  The issue of whether there should be a further devaluation of the Fund came up nine days *after* Bauer's redemption as a result of an email from the Fund's new

co-portfolio manager on October 12th.  In the email, he stated his belief that the prices received from Muller did not reflect fair value.  (Dkt. #391 at 7.)

(3)  On October 13th, fifteen days after its last pronouncement on valuation and ten days after Bauer redeemed, the pricing committee took the unprecedented and (to Bauer) unforeseeable step of applying an across-the-board "haircut" to the values of the holdings in the Fund's portfolio.  Bauer did not participate in this determination.  (Dkt. #400 ¶¶130-145.)  Specifically, after learning that Heartland's fixed income department could not provide fair values for the Fund's portfolio securities, and after determining not to accept the department's alternative valuations, the pricing committee "further reduced the individual portfolio security evaluations recommended by the Fixed Income Department  by an additional 33% for the Short Duration Fund."  (Dkt. #391 at 7-8.)

(4)  The SEC admits that the October 13th markdown of the Fund's entire portfolio was improper and did not reflect fair value.  (Dkt. #283 ¶¶70-73.)

(5)  In executing this markdown, the pricing committee jettisoned the procedures that required prices of individual bonds to be established by the Fund's independent outside pricing service.  Instead, the pricing committee applied a discount to the entire value of the Fund's portfolio based on factors wholly unrelated to the attributes of the individual securities.  The Fund's auditors later found these new discounted values to be unsupported.  (Dkt. #400 ¶¶139-145.)

(6)  The SEC does not dispute that the Fund's October 13th devaluation – ten days after Bauer redeemed – was principally due to the pricing committee's unprecedented

actions that day.  (Dkt. #400 ¶¶130-145.)  The SEC found that "[a]s a result, on

October 13, 2000, ... the NAV of the Short Duration Fund decreased by 44.0%, from

$8.70 to $4.87 from the previous day."  (Dkt. #391 at 8.)

   In short, the radical change in pricing methodology on October 13th was not known

to Bauer when she redeemed ten days earlier.

## III.    The District Court Erred in Determining the Element of Scienter Against Bauer.

   The district court correctly noted that scienter is a required element for an insider

trading charge and that scienter can be established by showing recklessness.

(App. 32-33.)  Recklessness in this context, however, means "an extreme departure from

the standards of ordinary care" and constitutes a "highly unreasonable omission;" it is

not a form of gross or "inexcusable negligence."  *Sundstrand Corp. v. Sun Chem. Corp.,*

553 F.2d 1033, 1045 (7th Cir. 1977) (citation omitted); *see also S.E.C. v. Lyttle*, 538 F.3d 601,

603 (7th Cir. 2008).

   The district court erred in finding no genuine dispute as to the SEC's claim that

Bauer acted with scienter.  Save for "exceptional" cases, scienter is a question of fact for

the jury.  *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998); *P.H. Glatfelter Co. v. Voith, Inc.,*

784 F.2d 770, 774 (1986) (summary judgment on fraud claims "is often difficult or

impossible").  As discussed below, this record is replete with factual disputes and

different inferences that can be drawn from the facts.  This is not the exceptional case

where scienter should have been determined on summary judgment.

**A. The District Court Failed to Grant Bauer Favorable Inferences from the Undisputed Facts Showing She Acted Without Scienter.**

Bauer presented the substantial evidence to show the district court that, in redeeming her shares, she did not act with scienter. To the contrary, Bauer acted openly and with no objection from HAI management or Fund counsel when she opened the window for Fund redemptions. And substantial evidence supports a finding that she did not believe the Fund was over-valued at the time of her redemption. In granting summary judgment, the district court either failed to consider certain evidence at all or viewed the evidence in a light favorable to the SEC.

*Opening the Trading Window.* On learning in August 2000 that the Funds' co-portfolio manager Thomas Conlin planned to resign, Bauer as general counsel restricted herself and others who knew about the pending resignation from trading in the funds that Conlin managed. On the morning of September 28, 2000, when HAI informed its employees of Conlin's resignation, Bauer expanded the trading restriction to cover all HAI employees until the resignation was publicly announced later that day. (Dkt. #400 ¶¶94-95.)

After the close of business on September 28th, when news of Conlin's resignation was already public, Bauer lifted the trading restriction. Importantly, Bauer had contemporaneously informed both the Funds' board and the Funds' outside counsel Quarles & Brady of the decision to lift the trading restriction, and neither outside counsel nor the board instructed or advised Bauer not to lift the trading restriction that

day.[48]  (Dkt. #400 ¶96.)

Once the trading window opened late on September 28th, Bauer did not redeem her shares; her redemption came five days later.

*Portfolio Managers' Valuation Assurance.*  Also five days before her redemption, Bauer heard the Fund's portfolio managers tell a September 28, 2000 pricing committee meeting that they were comfortable that the prices established by the Fund's independent pricing service (Muller) reflected fair value, and that therefore the Fund's shares were properly priced.  This reiterated the portfolio manager's prior stance at the September 20, 2000 pricing committee meeting.  (Dkt. #400 ¶87; Dkt. #426, ¶¶220, 248, 258.)  Thus, on September 28th the committee (including Bauer) determined it was appropriate to continue to use the values obtained from Muller.

*Pricing Analysis and Diligence Confirming Valuation.*  Bauer also knew at the time of her redemption that Heartland had recently conducted extensive comparative pricing analysis and due diligence that the investment professionals told her validated the reasonableness of the prices provided by Muller during August and September.  (Dkt. #400 ¶¶50-51.)

---

[48] A jury could reasonably conclude these facts show the absent of fraudulent intent, yet the district court chose the opposite inference - that Bauer's knowledge of the insider trading policy and restrictions supported a finding of scienter.  Similarly, the district court relied extensively on Bauer's detailed disclosures to Thomas Kirk *at the SEC*, of the same information that the court found actionable, the day before she redeemed.  (App. 30-31.)  However, Bauer's extensive disclosures to the SEC before she redeemed her shares is also a fact for the jury to weigh in determining whether Bauer had intent to deceive, and supports the inference that she did not.

*New Portfolio Manager Silent.*  At the time Bauer redeemed on October 3rd, the Fund's new co-portfolio manager, Phil Fiskow, had not yet expressed the concern that the Fund might be overvalued that he was apparently developing in private.  (Dkt. #426 ¶292.) Indeed, at the time she redeemed, Bauer had not yet even met Fiskow.  (Dkt. #400 ¶21.)

*Redemption* <u>After</u> *Price Decline.*  Bauer redeemed five days *after* the September 28, 2000 significant decline in the Fund's NAV.[49]  (Dkt. #400 ¶¶83-84.)  When Bauer redeemed, the Fund had *already* taken a price hit, and, as established above, the nonpublic information pertaining to the operation of the Fund pointed to improving performance.

*SEC Admission That Non-disclosures Were Merely Negligent.*  While charging Bauer with scienter – meaning intentional or severely reckless conduct – the SEC has elsewhere admitted that this case involves only negligence.  Specifically, in the parallel administrative proceeding that resolved this matter as to Bauer's co-defendants, the SEC admitted in official "findings" that any failure to disclose information concerning the Fund during the relevant time period before Bauer redeemed her shares resulted simply from "negligence."  (Dkt. #391 at 8-9.)  The SEC's admission, combined with the other evidence showing Bauer's lack of intentional or reckless misconduct, a jury could reasonably conclude she did not act with scienter.

-----

[49] Instead of crediting the reasonable inference that redeeming after a significant price decline negates fraudulent intent, the district court appears to have drawn another inference against Bauer, concluding these circumstances "raise[d] a red flag."  (App. 39.)

**B. The District Court Erred in Drawing Inferences Favorable to the SEC and Rejecting Inferences Favorable to Bauer Drawn from the Same Facts.**

In determining the issue of scienter on summary judgment, not only did the district court fail to credit evidence that a reasonable jury could use in determining Bauer acted without scienter, the court also chose to make inferences in favor of the moving party, and against Bauer, in discussing the evidence the court found supported a finding of scienter as a matter of law.

*Bauer's Occupation.* The court first relied on the fact that Bauer had a "background in securities law and had worked in the field for over twenty years," and was aware of HAI's policy against insider trading. (App. 33.) But in virtually every insider trading the defendant knows that insider trading is illegal, so this fact does not put this case into the exceptional category where scienter can be decided on summary judgment.

Moreover, the district court rejected the more reasonable inference to be drawn from the facts about Bauer's lengthy career as a securities lawyer. At the time she redeemed, Bauer had an unblemished reputation and career as a lawyer and securities industry professional. It is more than a fair inference for the jury to conclude that she would not consciously risk all this and her future livelihood to avoid relatively small losses of approximately $20,000. (Dkt. #400, ¶¶2-6.)

*Bauer's Reasons for Redemption.* The court next resolved disputed facts and inferences against Bauer related to her reasons for redeeming her Fund shares. The court relied on Bauer's testimony that she redeemed because she was "no longer comfortable with the volatility of that fund," including during the month of September 2000. (App. 34-35.)

Bauer's expressed concern over volatility does not *require* an inference supporting a finding of scienter.

Rather, another reasonable inference - one the district court was required to draw in Bauer's favor on summary judgment - is that redeeming because of fund volatility is an appropriate and legitimate reason for Bauer's redemption. The Short Duration Fund and every other fund made its price volatility known to all investors every single day. The daily up-and-down gyrations of fund prices are published in newspapers daily and are available online. If Bauer or other investors disliked the Fund's volatility reflected by those published prices, they could redeem their shares. This in no way establishes scienter.

Nor was it the district court's role to supplant the jury in weighing Bauer's statements about volatility (and the inferences the SEC and court drew from those statements) against Bauer's other solid and highly credible reasons why she redeemed. *First*, as the SEC admits, she was in serious negotiations for a new job in San Francisco and needed cash on hand to fund this expensive move. (Dkt. #410 ¶¶102-108.) *Second*, the redemption was consistent with past practice of using the account to invest cash reserved for large annual expenses – in past years, school tuition and property taxes. (Dkt. #400 ¶¶99-101.) An inference of insider trading from the timing and amount of a trade "can be nullified by a showing that sales in question were consistent in timing and amount with a past pattern of sales or that other circumstances might reasonably account for their occurrence." *Freeman v. Decio*, 584 F.2d 186, 197 n.4 (7th Cir. 1978).

Bauer was certainly entitled to this inference in opposing the SEC's summary judgment motion. *See S.E.C. v. Lipson*, 278 F.3d 656, 661 (7th Cir. 2002).[50] As the SEC has admitted, the facts surrounding the reasons for Bauer's redemption is a "credibility issue." (Dkt. #409 at 27.) Accordingly, the issue of scienter cannot be decided in the SEC's favor on summary judgment.

*Destruction of "Non-Pertinent" Information.* Finally, the court referred to an email Bauer sent on September 28, 2000 – five days before she redeemed her stock – regarding destruction of "non-pertinent" information that would somehow "prove" Bauer's "inside knowledge." (App. 35.) The court did not explain how "non-pertinent" information could conclusively prove "inside knowledge." In any event, a routine email on document retention or destruction procedures from in-house counsel to a wide distribution in no way reflected an intent to mislead when she redeemed her shares five days later.

Moreover, it is undisputed that nothing pertinent to the issues in this case was destroyed or otherwise concealed as a result of the e-mail. (Dkt. #427 ¶¶141-42, 190.) Nor did the email have the effect of somehow hiding the Fund's publicly known difficulties or the fact of her own redemption five days later. The redemption was duly

---

[50] It is for the jury to weigh the competing explanations for why an insider initiated a transaction, and there is no presumption that Bauer traded upon material non-public information, even if it could be established that she possessed material non-public information. *SEC v. Lipson*, 278 F.3d 656, 660 (7th Cir. 2002) (where defendant testified that he sold corporate stock because of an estate plan, this was "enough to satisfy his burden of production" and require a jury determination).

recorded on the funds books and appropriately processed, all in Bauer's own name. This is another example of the district court viewing the evidence favorable to the SEC rather than Bauer.

Based on the foregoing record evidence and reasonable inferences that should have been drawn in Bauer's favor (but were not), there is at least a genuine dispute for the jury over whether Bauer acted with scienter when she redeemed on October 3, 2000. Because scienter is another required element, it was error for district court to grant summary judgment to the SEC on its insider trading claim.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed, and the case should be remanded with instructions to enter summary judgment in favor of Defendant-Appellant Jilaine H. Bauer.

September 24, 2012                    Respectfully submitted,

                                     s/ Ryan S. Stippich

Stephen J. Crimmins                  Mark A. Cameli
K&L Gates LLP                        Ryan S. Stippich
1601 K Street NW                     Reinhart Boerner Van Deuren s.c.
Washington, DC 20006                 1000 North Water Street, Suite 2100
Telephone:  202-778-9000             Milwaukee, WI 53202
Facsimile:  202-778-9100             Telephone:  414-298-1000
                                     Facsimile:  414-298-8097


                                     *Attorneys for Defendant-Appellant, Jilaine H. Bauer*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the Defendant-Appellant, Jilaine H. Bauer, furnishes the following in compliance with Circuit Rule 32 and F.R.A.P. Rule 32(1)(7):

I hereby certify that this brief conforms to the rules contained in Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a)(7) for a brief produced with proportionally spaced font.  This brief was prepared with Microsoft Word using Book Antiqua font, with 12-point print used in the text and 11-point print used in the footnotes. Measured with the word count feature of the word processing program (including footnotes), the brief has 13,956 words.

Dated: September 24, 2012.

REINHART BOERNER VAN DEUREN S.C.
s/ Ryan S. Stippich

Mark A. Cameli
Ryan S. Stippich
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 2100
Milwaukee, WI 53202
Telephone:  414-298-1000
Facsimile:  414-298-8097

Stephen J. Crimmins
K&L Gates LLP
1601 K Street NW
Washington, DC 20006
Telephone:  202-778-9000
Facsimile:  202-778-9100

Attorneys for Defendant-Appellant, Jilaine H. Bauer

**CIRCUIT RULE 30(d) STATEMENT REGARDING APPENDIX**

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by Circuit

Rules 30(a) and (b) are included in the attached Appendix.

Dated: September 24, 2012.

REINHART BOERNER VAN DEUREN S.C.
<u>s/ Ryan S. Stippich</u>

Mark A. Cameli
Ryan S. Stippich
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 2100
Milwaukee, WI 53202
Telephone:  414-298-1000
Facsimile:  414-298-8097

Stephen J. Crimmins
K&L Gates LLP
1601 K Street NW
Washington, DC 20006
Telephone:  202-778-9000
Facsimile:  202-778-9100

Attorneys for Defendant-Appellant, Jilaine H.
Bauer

## CERTIFICATE OF SERVICE

The undersigned, counsel for the Defendant-Appellant, Jilaine H. Bauer, hereby certifies that on September 24, 2012, I electronically filed the Brief and Appendix of Defendant-Appellant with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that counsel for the Plaintiff-Appellee, Securities and Exchange Commission are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 24, 2012.

REINHART BOERNER VAN DEUREN S.C.
s/ Ryan S. Stippich

Mark A. Cameli
Ryan S. Stippich
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 2100
Milwaukee, WI 53202
Telephone: 414-298-1000
Facsimile: 414-298-8097

Stephen J. Crimmins
K&L Gates LLP
1601 K Street NW
Washington, DC 20006
Telephone: 202-778-9000
Facsimile: 202-778-9100

Attorneys for Defendant-Appellant, Jilaine H. Bauer